Good morning, Your Honors. Daniel Harris for the plaintiffs. May it please the Court. This case arises out of a lender's use of a contract that contradicts disclosures required under the Truth in Lending Act and has been used to take away substantive rights granted by that statute. Although it is primarily a disclosure statute, the Truth in Lending Act does grant a few substantive rights. One of these is the right to back out of certain home refinancing transactions up to three business days after you get the Truth in Lending Act disclosures. A closely related substantive right is the right to get back any money or property that you paid to the lender in connection with the transaction if you elect to rescind. The statute also requires that lenders disclose these rights to consumers clearly and conspicuously. Now, in this case, the plaintiffs, Larry and Janet Jones, refinanced their home mortgage through ETRADE MORTGAGE. And in connection with that transaction, they did receive a form disclosing their Federal rights. However, about a week before, they were made to sign a contract which contradicted that disclosure. That contract, and since a picture is worth a thousand words, if I could ask the Court to turn to page 34 of the excerpts of record so you have the contract in front of you, it's a one-page document. And since this whole case turns on how you interpret it, I think it may be helpful to have the text there. There are four things that this contract says on the subject of getting back the lock-in fee. One of them is that the lock-in fee will be credited, the borrower will receive a credit at closing. And if you look on the upper right, it says credit at closing, question mark. They check yes. Well, obviously, the word closing in this context means when the loan funds are dispersed, because prior to that time, there won't be any loan balance against which to apply a credit. The other thing that the contract says on the subject is that you're required to provide certain documentation to the lender within three days. And if you don't, it says applicant does not qualify for refund of lock deposit for any reason. And a couple paragraphs below that, it says, if you provide lender with all documentation requested of you within three calendar days to complete the underwriting review of your loan application, including but not limited to the information on the checklist, and following such review, lender does not approve your loan for closing based on income qualifying or credit, the lock-in fee will be refunded to you. If your loan fails to close for any other reason, including your decision to cancel the application, then the lock-in fee will not be refunded to you. I think that a reasonable, fair reading of this contract is that the only way you get the lock-in fee back, as opposed to getting a credit at the closing, is if the lender rejects the loan application. Otherwise, it's not. That's a reasonable, plausible, fair reading of the contract. But we don't have to rely on linguistic analysis alone here, because we have the advantage of a reality check. What happened here was that Larry Jones, on September 23rd, 2001, signed the mortgage papers. And on September 25th, he wants to back out. He checked the rates. They'd gone down. He wanted a different price, but he couldn't get that. He wanted to rescind. He called each rate. He asked, and he was told, you can back out, but you won't get your lock-in fee back. You know, these lock-in agreements are entered into usually to benefit the borrower, so that if the interest rate goes up, they're still going to get the benefit. And this is kind of apart from financing one's loan. Is it different, and should there be a capacity not to refund that? Well, Your Honor, I guess Congress has addressed that question by giving this substantive right, which is an exception for the Truth in Lending Act, because normally it's just a disclosure statute. But here they actually do give a substantive right. And each rate acknowledges that it is their corporate policy. Mind you, they say it's their corporate policy. Mind you, one that they disregarded here, to refund the lock-in fee if you do ask during the right time period, the three-to-eight magic period, although they didn't do it here. And all we're asking for is that their contract and their website say what they claim it means. So they can have lock-in contracts. The lock-in contracts can generally prohibit refunds of lock-in fees. But there ought to be an exception, because Congress has created an exception, for when somebody exercises their right to rescind under the Truth in Lending Act. And the contract ought to say that. And the fact that they don't say it in the contract and the natural reading of the contract is that it's just not refundable. Now, beyond that, Mr. Jones went ahead with a transaction, because he didn't want to have to fight to get the lock-in fee back. I mean, he was told they would hold it. So and then he complained to federal banking regulators. And they contracted each rate. And they were told basically the same thing. Our policy is that lock-in fees are not refundable unless we reject the loan application, which is what the contract says. So then the federal regulators wrote back to Mr. Jones and told him basically, well, you're right. You do have a right to get it back, but we can't do anything for you. So this lawsuit was filed. And in March of 2002, and as of May 8, 2002, after the lawsuit was filed, E-Trade says on its website, and I refer you to page 31 of the Excerpts of Records, we will collect a lock-in fee to lock in your interest rate. The lock-in fee will be credited toward your costs at closing. The lock-in fee is nonrefundable. There is no application or appraisal fee. So the natural normal reading of the contract is reinforced by how E-Trade itself has interpreted the contract. Nevertheless, after this lawsuit was filed, E-Trade and the district court came up with a different interpretation of the contract. E-Trade said, oh, no, no. The contract only applies up to the time that the borrower signs the loan papers. And thereafter, you do have this right to rescind and get your money back. But with respect, if you read the contract, that's not a normal natural reading of the contract. You read the contract, it appears to govern the refundability of lock-in fees generally, all the way up through the time the funds are dispersed, at which time you get a credit. It doesn't appear to have any sort of temporal limitation. And that's reinforced again by how E-Trade itself has interpreted the contract in this very case. Now, E-Trade based its interpretation or reinterpretation of the contract on the word close. But with respect, the word close or closing is ambiguous. It can refer not only to the time that the borrower signs the loan papers, but also to the time that the loan funds are dispersed. And, in fact, as we just saw on page 31, where E-Trade says on its website, the lock-in fee will be credited towards your cost at closing.  And, again, if you would return to the lock-in agreement itself, it says credit at closing, the word closing being used to refer to the time that the loan funds are dispersed. And across from that, a little bit up to the left, you may notice estimated closing date, 9-29-01, which, as it happens, was six days after they signed the papers and after the expiration of the statutory rescission period. Now, the test here isn't whether E-Trade can, after the fact, come up with a saving construction of the contract that reconciles it with the federal disclosures. The question is whether there is a plausible interpretation of the contract that is inconsistent with, contradictory with the federal disclosures. And here, I submit the normal, natural reading of the contract. And E-Trade's own interpretation of the contract is inconsistent with the federal disclosures. Now, I'd like to emphasize the limited, very limited nature of what we're complaining about and what would be necessary to fix the problem. We're not attacking the general concept of a lock-in fee. We're not attacking the general idea that they should be generally nonrefundable. All we're saying is that a sentence should be added to the contract and to the website that says what they claim it means, that the lock-in fee is also refundable if you elect to exercise your right of rescission under the Truth in Lending Act. This shouldn't be a problem for E-Trade because they say that's what their corporate policy is. Mind you, it's not a corporate policy they followed in this case, not the corporate policy they told federal regulators about. But if you take them at their word that that is, in fact, their corporate policy, then it shouldn't be a problem to say it in the contract and on the website. If there are no questions, I'd like to reserve the balance of my time. Thank you. Good morning. May it please the Court, Douglas Lobel on behalf of E-Trade Mortgage and E-Trade Bank. There's nothing in this statute or the legislative history of TILA or the regulations governing TILA or the regulatory history of TILA that suggests that a borrower who walks away from a loan application is required by TILA or entitled to get all of the fees paid back. In fact, what Appellant advocates here would be a radical change in the law of TILA. There's no case that supports that. There's no language in the statute or otherwise that suggests that TILA applies to that phase of a transaction. And that rule would change mortgage lending in this country entirely because these lock-in fees, as Your Honor pointed out, are quite common. They're very much for the benefit of the borrower who gets the certainty of a fixed interest rate in a volatile interest rate environment. The plaintiffs are trying to impermissibly expand TILA in this situation to cover an instance never contemplated or intended by Congress. That is where the loan has not yet closed. Well, is your position if he had rescinded, he would not have gotten the lock-in fee back? He absolutely would have gotten the lock-in fee back, Your Honor. Under TILA Section 1635, he's entitled to. So that's not an expansion. That's just an attack on the lock-in fee. It's just a fact. You say that's what would have happened. But he was misled, as I understand it, by one of your employees. Well, Your Honor, he wasn't misled because, in fact, deeming the allegations of the complaint to be true, he claims that he knew that was untrue when he was allegedly told that. He is a bank examiner. He has significant information about these matters. And he says in his complaint he knew it wasn't the case. But in any event, Your Honor. He knew it was not the case, but he nonetheless acted on it? Apparently that's the case. He knew it was not the case. He contends that in his complaint. I'm sorry. I'm not. Tell me where in the complaint that's stated. Yes, Your Honor. In paragraph 22 of the complaint, Your Honor, on page 10. It states that it states what Mr. Jones was allegedly told. And then Mr. Jones goes on to explain that under Regulation Z, a consumer is entitled to a refund of all monies paid as part of the credit transaction if rescission is exercised in a rescindable transaction. This is on page 10, Your Honor. Paragraph 22. Paragraph 22. It looks like page 11. They're different pages. I'll tell you, Your Honor, I'm looking at. He goes on to say that Mr. Royer said that E-Trade mortgage was not governed by Regulation Z and also insisted that Mr. Jones would forfeit the money and that Regulation Z only required a refund of closing costs. That is what's alleged, Your Honor. Well, you were saying his complaint contradicted that position. Does it or does it not? I'm sorry, Your Honor, I don't understand the question. Your answer to me was that the complaint somehow contradicted his claim. Does it or does it not? Well, I'm not saying it contradicts his claim. What I'm saying is when he was allegedly told this by Mr. Royer. Yes. He knew it was untrue. How do we know he knew it was untrue? Well, because he says he tells Mr. Royer what Regulation Z requires. He's a highly unusual consumer who has working knowledge of Regulation Z, and he goes on to tell Mr. Royer exactly what Regulation Z, which is the regulation governing TILA, requires. But then the bank says, but we don't have to come under Regulation Z for this part of the transaction. Your Honor, I — excuse me. I recognize that as an allegation in the complaint. For purposes of this proceeding, we must deem it to be true. But I would suggest to the Court that what we're looking at and what this case relates to is not that statement, because it's not alleged that that statement itself is a violation of TILA. If you look at the issues presented in this case, what Pellin is claiming is that you have to put these two documents side by side, and that when you read them side by side, they're confusing and misleading. But certainly we can take into account what your employee told them, interpreting TILA. Are we supposed to ignore that? Well, Your Honor, actually the law is very much reluctant to allow oral misrepresentations that allegedly contradict written disclosures in TILA. And this is an issue that was not briefed by either side, because the appellant knows that he would never get class certification. If he were to rely on an oral statement. It seems to me that I had a case not so long ago where we went on the oral representations. Well, Your Honor, there's a case, Northern District of Illinois, 1993, Westlaw, 69649. Quote, The law is apparently settled that misleading oral representations made at the time of proper written disclosures do not negate compliance with the law. That's a TILA case. Well, I can't give you the name of our case, but it's a Ninth Circuit case that says representations made by the agent of the lender may be taken into account. Well, I think that's true, Your Honor. But I think in every instance you'll see that they are written representations. A TILA is a. No, these are oral representations. Well, Your Honor, I. So that's Ninth Circuit law. You better look it up. I can't. I'm sorry I can't give you the name of the case. Well, Your Honor, then I. Then he must have missed it because we've searched high and low. Well, Your Honor, I've got two Fifth Circuit cases, one Fourth Circuit case. What's the ninth? Your Honor, I can assure you that we did. And these cases, which I would like to supply to the Court in supplemental briefing if you'd care to, are based on an FTC opinion, which I believe is entitled to some Chevron deference. And the FTC, Your Honor, stated in a staff opinion that a written disclosure statement given to the consumer as required by TILA before consummation of the transaction is a protection against oral misrepresentations that induce a loan. That is exactly what occurred here. In other words, I believe that the FTC did not want the lenders to be put in a situation where any offhand comment made by a closing agent, a secretary, anyone at a closing could be deemed to be a violation of TILA. And that's exactly what's. Well, why should the borrowers be in the position of where the person they're dealing with who represents the lender tells them things that aren't true and misleads them? Well, I don't think that. It's a very strange thing. You can run around TILA if you can get away with oral misrepresentations. Well, Your Honor, I agree. And I certainly don't endorse that. But I think that what TILA is directed to is the disclosures. The E-Trade mortgage gave the Federal Reserve standard form disclosure. But if you have an employee telling the borrower something different, why shouldn't that come into the equation? Well, Your Honor, I. I don't understand it. I think the reason it shouldn't come into the equation is because the courts are very reluctant to convert offhand oral statements into TILA violations. I've got. Offhand? But this is the person the borrower has to deal with. And I tell you, in the case I'm recalling faintly, the agent of the lender then disappeared. So the lender was rather at a disadvantage as to saying what happened. But it was the borrower who testified to the representation. And I think you're going to find, Your Honor, that if this decision is reversed, that's exactly what will have happened here. They didn't even ask for a hearing. It's final. Well, Your Honor, I'm at a disadvantage because I'm not familiar with the opinion. I do have two Fifth Circuit cases that stand for the proposition that oral statements. You're out of circuit. I'm sorry? You're out of our circuit. I am out of your circuit, Your Honor. I couldn't find anything in the Ninth Circuit. But all of these cases do rely on this FTC staff opinion. And the courts appear to be in these other cases very reluctant to allow, for example, a number of these are parole evidence cases. And they do not admit oral statements that allegedly contradict the TILA disclosures. It won't be the first time the Ninth Circuit has a different view. Your Honor, I'm going to go back and search as hard as I can to find that case because we couldn't find it in preparing for this argument. But I would say to the Court that that is not what Appellant's case is about. Appellant, as you heard for ten minutes, would like this Court to compare two documents and would like you to simply put the two documents side by side and say, are they misleading and confusing when read together. And, Your Honor, you heard very little about the oral statement because they know that they can't get class certification if you base your decision on an oral assertion to one class member. And they have not asserted that as an issue presented in this appeal, if you look at the issues presented in Appellant's brief. And I would suggest to the Court that there is no question that we're dealing with two different phases of a transaction, the pre-closed phase, which the lock-in fee discusses and the post-closed phase, where there's consummation of a transaction and the obligor then has rights of rescission. I would note that on the excerpt of record, page 34, which is the lock-in agreement, there are at least seven or eight references, and this is the document that my opponent reviewed with you, seven or eight references to the fact that the loan might not close, that if the loan fails to close, the lock-in fee will not be refunded. I suggest to the Court that there is nothing I can think of or that I think anyone could do to make it clear that this is, that there is not an assurance that this loan will close, that this is a pre-closing phase of the transaction. And the Congress has made it clear that they don't want TILA to apply to that phase of the transaction, that it is only to apply once there is a consummated transaction, meaning once there is a credit obligation and the borrower's principal residence is now at risk or is taken as collateral. So I would suggest that there is absolutely no issue as to inconsistency between the two written documents. And I would ask permission from the Court to brief this issue of the oral disclosures in five or ten pages, which, again, was not addressed by either party because the I would just like to remind the Court that this case was decided on a motion to dismiss, and the question is whether there is any set of facts consistent with the allegations of the complaint that would support a cause of action. And if there are no further questions, I'll stop there. Thank you. Thank you for your time. Thank you. Thank you for your arguments. We appreciate it. The matter will stand submitted. The next case on today's calendar is Philadelphia Indemnity Insurance.
judges: B. Fletcher, Noonan, Paez